IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ROY LEE SALYERS,** | ) | |
|     Plaintiff | ) | |
| v. | ) | Civil Action No. 2:15cv00005 |
| | ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
|  Acting Commissioner of | ) | |
|  Social Security, | ) | By:   PAMELA MEADE SARGENT |
|     Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Roy Lee Salyers, ("Salyers"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Salyers protectively filed his applications for SSI and DIB on February 14, 2012, alleging disability as of January 24, 2012, due to chronic obstructive pulmonary disease, ("COPD") and back and hip problems. (Record, ("R."), at 172-79, 195, 199.) The claims were denied initially and upon reconsideration. (R. at 80-82, 87-89, 93-97, 99-104, 106-08.) Salyers then requested a hearing before an administrative law judge, ("ALJ"). (R. at 109.) A hearing was held on November 25, 2013, at which Salyers was represented by counsel. (R. at 25-41.) At his hearing, Salyers amended the date of his alleged onset of disability to December 1, 2012. (R. at 28.)

By decision dated January 17, 2014, the ALJ denied Salyers's claims. (R. at 11-20.) The ALJ found that Salyers met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2016. (R. at 13.) He found that Salyers had not engaged in substantial gainful activity since December 1, 2012, the amended alleged onset date. (R. at 13.) The ALJ found that the medical evidence established that Salyers had severe impairments, namely chronic back pain, back spasms and hip and right knee pain, but he found that Salyers did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ found that Salyers had the residual functional capacity to perform medium[1] work that did not require him to crawl; that did not require more than occasional climbing, balancing, stooping, kneeling and crouching; and that did not require him to work around fumes, odors, dusts, gases

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2015).

or poor ventilation. (R. at 15.) The ALJ found that Salyers was unable to perform any of his past relevant work. (R. at 18.) Based on Salyers's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Salyers could perform, including jobs as a hand packager, a stock clerk and a material handler. (R. at 18-19.) Thus, the ALJ concluded that Salyers was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 19-20.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2015).

After the ALJ issued his decision, Salyers pursued his administrative appeals, (R. at 6), but the Appeals Council denied his request for review. (R. at 1-4.) Salyers then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2015). This case is before this court on Salyers's motion for summary judgment filed December 23, 2015, and the Commissioner's motion for summary judgment filed March 15, 2016.

## II. Facts

Salyers was born in 1954, (R. at 172, 176), which classifies him as a "person of advanced age" under 20 C.F.R. §§ 404.1563(e), 416.963(e). Salyers obtained his general equivalency development, ("GED"), diploma and has past relevant work experience as a laborer for a drilling operation, a maintenance man and a painter. (R. at 28-29, 38, 200.) Salyers testified that he could not work because of pain in his low back and joints, including his hips and right knee. (R. at 30.) He testified that the medications he took helped with the pain. (R. at 30.)

-3-

Case 2:15-cv-00005-PMS   Document 21   Filed 05/27/16   Page 3 of 12   Pageid#: 501

Barry Hensley, a vocational expert, was present and testified at Salyers's hearing. (R. at 38-40, 156.) Hensley was asked to consider a hypothetical individual of Salyers's age, education and work history who had the residual functional capacity to perform medium work, who could occasionally climb, balance, stoop, kneel and crouch, but never crawl, and who could not work in poorly ventilated areas. (R. at 38.) Hensley testified that such an individual could not perform Salyers's past work, but that there were other jobs existing in significant numbers in the national economy that he could perform, including those of a hand packager, a stock clerk and a materials handler or mover. (R. at 38-39.) Hensley testified that an individual who could lift and/or carry items weighing five to 10 pounds occasionally; who could occasionally stoop, balance, reach, handle, push and pull; who could never climb, kneel, crouch or crawl; who should avoid concentrated exposure to heights, moving machinery, temperature extremes, chemicals, trucks, noise, fumes, humidity and vibration; and who would be absent from work more than two days per month, could not perform any work. (R. at 39.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Dr. Thomas M. Phillips, M.D., a state agency physician; Dr. Amor Barongan, M.D.; Mountain View Regional Medical Center; Wellmont Lonesome Pine Hospital; Norton Community Hospital; NightHawk Radiology Services; Dr. Robert McGuffin, M.D., a state agency physician; and Medical Associates of Norton.

Prior to December 1, 2012, Salyers was intermittently treated for complaints of low back and hip pain; gastroesophageal reflux disease, ("GERD"); COPD; seasonal allergies; hyperlipidemia; goiter; and right shoulder pain. (R. at 270-72, 274-81, 291-330, 337, 347-51, 356-79.) On August 21, 2007, Salyers was admitted to Norton Community Hospital with complaints of right lower extremity pain and

swelling. (R. at 361-68.) A CT scan of Salyers's chest showed moderately prominent mediastinal lymph nodes and a right renal cyst. (R. at 345-46.) A CT venography of Salyers's lower extremities showed no evidence of deep vein thrombosis and a possible Baker's cyst. (R. at 358.) Salyers was diagnosed with Baker's cyst of the right gastrocnemius muscle, deep vein thrombosis was ruled out and cellulitis. (R. at 364.)

On December 3, 2007, x-rays of Salyers's sacrum and coccyx showed degenerative changes in the lower lumbar spine and degenerative changes at the sacroiliac joints bilaterally. (R. at 357.) On February 1, 2008, an ultrasound of Salyers's thyroid gland showed a goiter. (R. at 356.) On April 24, 2008, a CT scan of Salyers's chest showed small lymph nodes in the mediastinum and pleural-based nodules in both lung apices. (R. at 350.) On July 1, 2008, an MRI of Salyers's lumbar spine showed spondylitic changes; bulging discs at the L2-L3, L3-L4 and L4-L5 levels; narrowing of the L5-S1 disc space with desiccation of the discs; and a tear in the annulus with mild protrusion of the disc posterolaterally on the left side at the L5-S1 level, resulting in slight narrowing of the neural foramen. (R. at 348-49.) On April 22, 2009, an x-ray of Salyers's right shoulder showed arthritic changes at the head of the humerus. (R. at 347.)

On October 24, 2011, and November 23, 2011, Salyers saw Dr. Amor A. Barongan, M.D., for complaints of joint pain, swelling, stiffness and decreased range of motion. (R. at 311-13, 317-19.) Salyers had a normal posture and gait and, his mood and affect were described as normal. (R. at 312, 318.) His examination was normal with the exception of moderate tenderness in his lumbosacral spine and large areas of skin color loss below his knees. (R. at 312, 318.) A chest x-ray showed COPD. (R. at 278.) Throughout 2012, Salyers reported low back pain; joint pain, swelling and stiffness; dyspnea upon exertion; wheezing; productive

cough; and decreased range of motion. (R. at 291, 296, 300, 305-06, 308, 399-411.) Dr. Barongan's examinations revealed tenderness, limited ranges of motions and swelling, but normal gait, posture, mood and affect. (R. 292, 296, 301, 306-07, 310, 407, 410-11.)

On February 22, 2012, examination of Salyers's lumbosacral spine revealed tenderness and abnormal curvature. (R. at 307.) He had limited range of motion in his right shoulder and tenderness in both shoulders. (R. at 307.) Examination of Salyers's hands revealed tenderness and swelling, and he had tenderness, crepitus and abnormal sensation in his right knee. (R. at 307.) X-rays of Salyers's lumbar spine showed moderately severe multilevel spondylosis. (R. at 276.) On February 24, 2012, a pulmonary function study showed only mild airway obstruction.[2] (R. at 379.) On February 28, 2012, a CT scan of Salyers's lumbar spine showed multilevel spondylosis, especially at the L5-S1 level, with suspect right posterior paracentral disc protrusion and multilevel disc bulges. (R. at 270-71.) On April 16, 2012, Dr. Barongan completed paperwork for Highlands Drilling concerning Salyers's ability to perform his past work. (R. at 298-99.) Salyers previously indicated that he planned to file for disability; however, he had been called to return to work and wanted to do so. (R. at 298.) Dr. Barongan noted that Salyers was able to perform all duties of "floor hand" and that his judgment was not impaired. (R. at 299.)

During 2013, Salyers continued to report symptoms associated with his low back pain; COPD; joint pain; seasonal allergies; and GERD. (R. at 385-98, 415-28.) Salyers reported that Lortab helped his pain. (R. at 385, 390, 394, 402, 419, 423, 426.) Physical examinations showed tenderness of Salyers's lumbosacral spine, with radiation down his posterior right leg, occasional decreased breath

---

[2] Salyers smoked one-half pack of cigarettes per day in February 2012. (R. at 305.)

sounds and tenderness, crepitus and abnormal sensation of his right knee. (R. at 387, 392, 397, 417, 421.) Salyers's gait and posture remained normal. (R. at 387, 392, 397, 417, 421.) On January 31, 2013, x-rays of Salyers's hips were normal with minimal enthesopathy[3] of the ischial tuberosities.[4] (R. at 380.) On February 27, 2013, Salyers reported good compliance with treatment and fair symptom control. (R. at 390.) Dr. Barongan noted that Salyers's lumbar disease had been stable since his diagnosis. (R. at 390.) In March 2013, Salyers reported that he was unemployed and looking for work; however, by May 2013, he reported that he was "waiting on disability." (R. at 386, 423.) On August 1, 2013, Salyers reported that he felt well and that his energy level was good. (R. at 419.) On October 1, 2013, Salyers presented for pain management. (R. at 415.) He reported that he had been laid off and that he was applying for disability. (R. at 415.)

On November 1, 2013, Dr. Barongan completed a medical assessment indicating that Salyers could occasionally lift and carry items weighing five to 10 pounds. (R. at 342-44.) She opined that Salyers could stand, walk and/or sit a total of two hours in an eight-hour workday and that he could do so for 30 minutes without interruption. (R. at 342-43.) Dr. Barongan found that Salyers could occasionally stoop and balance and never climb, kneel, crouch or crawl. (R. at 343.) Salyers's abilities to reach, to handle and to push/pull were limited. (R. at 343.) Dr. Barongan found that Salyers would be restricted from working around heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes,

---

[3] Enthesopathy is defined as a disease occurring at the site of attachment of muscle tendons and ligaments to bones or joint capsules. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 269-70 (1995).

[4] Ischial tuberosity is defined as a rounded protuberance of the lower part of the ischium. It forms a bony area on which the human body rests when in a sitting position. *See* http://www.medical-dictionary.thefreedictionary.com/ischial+tuberosity (last visited May 27, 2016).

humidity or vibration. (R. at 344.) She opined that Salyers would be absent from work more than two days a month. (R. at 344.)

On December 13, 2012, Dr. Robert McGuffin, M.D., a state agency physician, noted that Salyers's claim was being denied based on insufficient evidence and for Salyers's failure to respond. (R. at 64.)

On May 30, 2012, Dr. Thomas M. Phillips, M.D., a state agency physician, found that Salyers had the residual functional capacity to perform medium work. (R. at 46-47.) He found that Salyers could frequently climb ramps and stairs, kneel, crouch and crawl and occasionally climb ladders, ropes and scaffolds. (R. at 47.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 47.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2015). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2015).

-8-

Case 2:15-cv-00005-PMS   Document 21   Filed 05/27/16   Page 8 of 12   Pageid#: 506

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§

404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Salyers argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5). Salyers also argues that the ALJ erred by failing to give controlling weight to the opinions of his treating physician, Dr. Barongan (Plaintiff's Brief at 4-5.)

The ALJ found that Salyers had the residual functional capacity to perform medium work that did not require him to crawl; that did not require more than occasional climbing, balancing, stooping, kneeling and crouching; and that did not require him to work around fumes, odors, dusts, gases or poor ventilation. (R. at 15.) Salyers argues that the ALJ failed to give controlling weight to the opinions of his treating physician, Dr. Barongan, in assessing his residual functional capacity. (Plaintiff's Brief at 4-5.)

Based on my review of the record, I find this argument unpersuasive. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2015). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

The ALJ noted that he considered Dr. Barongan's opinion dated November 1, 2013, wherein she opined that Salyers was limited to a reduced range of sedentary work. (R. at 18.) The ALJ noted that he was giving this opinion limited weight because the severity of Dr. Barongan's assessed restrictions were not fully supported by the longitudinal conservative treatment record and Salyers's reported ongoing capabilities. (R. at 18.) Based on my review of the record, I find that substantial evidence exists to support this finding. Although diagnostic studies confirmed moderately severe degenerative lumbar irregularities, COPD and periodic swelling in the lower extremities, physical examinations repeatedly noted normal gait and posture, and a pulmonary function study noted no more than mild obstruction. (R. at 387, 392, 397, 404, 417, 421.) In fact, in 2012, Dr. Barongan stated that Salyers's lumbar disease had been stable since his diagnosis and that he was capable of returning to work without any restrictions. (R. at 298-99, 390.) Salyers reported good compliance with treatment and fair symptom control. (R. at 390, 402, 419, 426.) He took medications as needed for pain and frequently reported that it helped his pain. (R. at 385, 390, 394, 402, 419, 423, 426.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Despite recurrent symptoms of pain and shortness of breath, there is no evidence of acute complications requiring hospitalization or further evaluation. In April 2012, Salyers reported that he retained the capacity to perform his assigned work responsibilities, with some modification, at the gas drilling company. (R. at 298-99.) The ALJ also noted that Salyers retained the capacity to take care of most personal needs, household chores, take walks outside and do whatever needed to be done. (R. at 32-33, 35, 220-24.) In addition, the ALJ also considered the findings of Dr. McGuffin and did not fully accept his opinion because it was contrary to the longitudinal record submitted at the hearing, the history of

conservative treatment and Salyers's documented ongoing capabilities. (R. at 17.) Although and ALJ must consider the findings made by state agency medical consultants at the initial and reconsideration levels of review, an ALJ is not bound by their findings. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), (ii), 416.927(e)(2)(i), (ii) (2015).

Based on the above reasoning, I conclude that substantial evidence does support the ALJ's weighing of the evidence, and I further find that substantial evidence exists in the record to support the ALJ's residual functional capacity finding. An appropriate Order and Judgment will be entered.

DATED: May 27, 2016.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE